UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


SOFTUB, INC.,                    )
                                 )
            Plaintiff,           )
                                 )
                                 )    CIVIL ACTION NO.
                                 )    12-10619-DPW
          v.                     )
                                 )
MUNDIAL, INC.,                   )
                                 )
            Defendant.           )


MEMORANDUM AND ORDER
September 30, 2014

Plaintiff Softub, Inc. brought this action against Defendant
Mundial, Inc. to recover damages allegedly caused by Mundial's
sale of defective pumps to Softub for use in portable spa tubs it
manufactured.  The gravamen of Softub's complaint is that Mundial
marketed and sold to it a product that Mundial knew or should
have known was not suitable for use in spa tubs like those
manufactured by Softub, and in doing so breached various
contractual obligations including warranties express and implied,
in addition to making actionable misrepresentations.

In its defense, Mundial argues both that it has already
satisfied all of its warranty obligations to Softub, and
moreover, that as a sophisticated business entity with knowledge

-1-

of spa design and manufacture, Softub bore sole responsibility for determining the fitness of Mundial's product for its purposes. Mundial alternatively argues that Softub should have abandoned use of the pump far sooner than it did, and by continuing to purchase and use the pump despite knowledge of its high failure rate, Softub failed to mitigate its damages.

In its eleven-count amended complaint, Softub asserts claims for intentional and negligent misrepresentation (Counts I-II), breach of contract (Counts III and VIII), breach of the implied covenant of good faith and fair dealing (Counts IV and IX), breach of warranties both express (Count V) and implied (Count VI), and violation of Mass. Gen. Laws ch. 93A, § 11 (Counts VII and X).[1] Softub seeks as damages actual and consequential damages, lost profits, and "all other financial and economic losses caused by Mundial's breaches of express and implied warranties." Mundial has asserted counterclaims against Softub alleging that Softub itself violated Chapter 93A (Counterclaim One) and improperly withheld payment for pumps which it received from Mundial (Counterclaim Two).

Following a bitterly contentious discovery period during which each party accused the other of myriad discovery violations

---

[1] Softub also seeks a declaratory judgment with respect to Mundial's obligation to indemnify it for all damages causally flowing from Mundial's alleged breach of contract (Count XI).

and moved to strike much of the relevant evidence in this case on
that basis, Mundial has now moved for summary judgment on all of
Softub's claims.  Mundial additionally seeks to preclude a Softub
expert from testifying at trial.  Softub opposes Mundial's motion
for summary judgment and moves for partial summary judgment on
Count One of Mundial's counterclaims.  I will address all
outstanding motions in this memorandum.

## I.  BACKGROUND

The following facts are presented in the light most
favorable to Softub, reserving certain details for discussion in
connection with specific issues.[2]

Softub is a California-based manufacturer and retailer of
soft-sided portable hot tubs and spas.  Since 2008, all of its
manufacturing and shipping operations have been located at a
facility in New Bedford, Massachusetts.  Mundial, Inc., based in
Walpole, Massachusetts, is the United States distributor and
sales and marketing arm for its Brazilian parent corporation,
Mundial, S.A.

At the outset, it is necessary to distinguish between two
related but distinct products implicated in this litigation: spas
and whirlpool baths.  Although the names are sometime used

---

[2] Facts relevant to Mundial's counterclaims, which are limited in
scope, will be viewed in the light most favorable to Mundial.

interchangeably, a spa (or hot tub) differs from a whirlpool bath substantially.  Whirlpool baths are usually installed indoors, and the water used is typically drained after each use.  As a result, a whirlpool bath's pump operates only when the whirlpool is filled with water and in use.  In contrast, the water in a spa (or hot tub) is not drained and replaced between each use.  This means that a spa's pump must operate for longer durations than a whirlpool's pump, and also must be able to withstand exposure to chemicals that are used to keep the water clean.  Compared to a whirlpool, spa components must contend with a greater amount of debris in the water, including sand, dirt, lint, fibers, and organic materials such as leaves, grass and pine needles.

## A.  *Softub's Introduction to Mundial*

In July 2005, David Hall, a sales representative for Mundial, cold-called Jeffrey Collins, Softub's Director of Operations, to introduce Softub to Mundial's "Syllent"[3] brand pump.  As Hall described it, the Syllent pump was an "ultra quiet . . . integrated pump and motor" that used heat exchange to cool the motor and maintain water temperature.  Collins, along with Softub's President and Chief Operating Officer, Edward McGarry, met Hall in July 2005 at Softub's headquarters in Valencia, California.  McGarry and Collins showed Hall the various spas

---

[3] Pronounced "silent."

manufactured by Softub, a complete "power pack," consisting of the pump then being used and the controls for the spa. After the meeting, Hall represented in an email to Collins that "I truly believe we have [a] product that is a perfect fit for you."

The Syllent pump operated differently from the pumps that Softub had previously employed; instead of utilizing a separate heat-exchange coil wrapped around the motor to capture heat, its design allowed water to flow directly through the motor components. Softub, which was interested in the prospect of a quieter pump, agreed to test samples of the Syllent pump to determine if they performed adequately in Softub's application.

Between 2005 and 2007, Hall provided several versions of the Syllent pump to Softub for testing purposes. During this period, Hall made numerous representations regarding the Syllent's pump fitness for Softub's spa application. In a September 6, 2005 letter communicating a per-unit offer price, Hall indicated that the pumps would carry a five-year warranty in Softub's application. In an email dated November 1, 2005, Hall represented to McGarry and Collins that "no other pump can provide you the ability to guarantee against leaks and seal failures – our product is proven to operate in conditions of like use with your product. We are backing this up with a five year performance warranty." Hall provided Softub with a specification

sheet indicating that the Syllent pump was designed to operate in water temperatures of up to forty-five degrees Celsius, and was therefore appropriate for use in Softub spas, which typically operate at between forty and forty-two degrees Celsius. Hall also represented to Collins that the Syllent pump was approved for safe operation by Underwriters Laboratory ("UL") and provided Softub a copy of the UL report. In November 2005, in response to concerns raised by Collins about the Syllent pump's ability to handle debris in the water, Hall stated that the pump "can handle small amounts of small debris" and that he had tested the pump himself with "handfuls of dirt and various sized grained sand used for brick mortar mix" and found "no problem with particles that got through the inlet cover jamming the pump."

By July of 2006, Softub's Collins had prepared a written report summarizing the results of Softub's performance testing of the Syllent pump. Although he found the Syllent pump to be "very quiet" and capable of heating water quickly enough for Softub's application, he identified a number of concerns with the pump based on pump failures experienced during testing. As summarized by Collins in an email to Hall, Softub experienced "issues with the rotor / impeller, potting, leaking into the electronics and the units heating up, [drawing] more power and shutting off."

Mundial responded by arranging for Ricardo DeFacci, the pump's inventor and an employee of Mundial's Brazilian parent corporation, Mundial, S.A., to meet with Collins and address his concerns.  In written correspondence with Softub, DeFacci blamed most of the issues on Softub's testing process and indicated that the issues either should not arise under conditions of normal use or were simply indicative of normal wear and tear and should not be cause for concern.  DeFacci further indicated that Mundial, S.A. had made a number of improvements to the pump, and specifically the rotor assembly, since Softub had completed its testing.  For example, DeFacci stated that "[t]he design of the rotor has changed: In the end of 2005, based in our tests with the hot water circulation pump, we started to produce rotors covered with a specially [sic] powder epoxi coating, more resistant for this new conditions."

Following DeFacci's review, Mundial's vice president of sales, Rich Zirpolo, indicated that he would "also make available prototypes (at least) that incorporate all the changes we're making to accommodate the needs of the US market."  In separate correspondence, Zirpolo represented that "[b]ased on input from Softub, other US accounts, our on-going Brazilian experience and our own product development people — the pump that rolls off the

line in Brazil today is a notably different, more powerful product than the samples we sent to Softub last August."

In October 2006, DeFacci traveled to Softub's facility in Valencia, California in an effort to assuage any remaining concerns Softub had with the Syllent pump. Over two days, DeFacci toured the Softub facility, inspected power pack assemblies, and examined the spa application for which Softub sought to use the Syllent pump. At that time, DeFacci reiterated that recent enhancements to the pump should correct problems experienced by Softub, particularly with respect to rotor corrosion. DeFacci then indicated in a November 2006 follow-up email to Collins that since his visit to Softub, "we have been worked 100% on the rotor issue . . . [and] have found very good results and now we are preparing 10 samples . . . for your field tests."

Upon receiving the samples of the new version of the pump incorporating the new polyester electrostatic powder coated rotors, Collins tested them "simply to confirm that the performance matched that of the earlier versions [he] had previously tested." Collins "did not undertake to independently test whether the 'new' pump's various modifications, not all of which were even known to Softub, were sufficient to resolve all the concerns that the modifications were intended to address."

Nevertheless, by May of 2007, Collins was satisfied that the new version of the pump addressed the previously identified issues. In an email to Zirpolo dated June 4, 2007, Collins indicated that the rotor corrosion issue had been resolved to his satisfaction, and that DeFacci's handling of the situation gave Softub "the necessary confidence in the ability to solve issues as they arise in the future."

**B.    *Softub Begins Using Syllent Pump in Spa Manufacture***

By letter dated October 15, 2007, Zirpolo provided Softub with updated pricing information for the Syllent pump, and indicated that under new terms and conditions, all Syllent pumps would carry a three year warranty from the date of installation. On November 6, 2007, McGarry and Karen Dilley, Softub's vice president of manufacturing, met with Zirpolo at Mundial's Walpole offices to discuss the terms contained in Zirpolo's October 15 letter and establish a plan for moving forward.  At the meeting, McGarry requested that the pump's warranty be extended to five years to meet Softub's expectation that the pumps would operate for the lifetime of a typical Softub spa.  Zirpolo acceded, and wrote in a follow-up email memorializing the terms agreed upon at the November 6 meeting that "[w]arranty on all items will be 5 years to agree with Softub's existing product warranties." Satisfied with the five-year warranty, Softub committed to

purchase a specified minimum quantity of Syllent pumps for

delivery beginning in the first quarter of 2008.

On November 27, 2007, Dilley sent Zirpolo Softub's initial

purchase order for 1050 pumps for the domestic market and 1050

pumps for the export market.[4]  The reverse side of the purchase

order contained boilerplate terms and conditions, including

Softub's terms for acceptance by Mundial, an indemnity provision,

and a warranty provision.  Zirpolo acknowledged in his deposition

that he personally received this initial Softub purchase order

and subsequent purchase orders, and that all such orders

contained the same boilerplate terms and conditions.

After receiving a purchase order from Softub, Mundial would

ship the pumps from its Walpole facility to Softub's New Bedford

facility along with a packing slip.  Contemporaneously to its

shipment of the pumps, Mundial would separately send invoices to

Softub's Valencia offices, which the Softub accounting department

would cross-check against receipt confirmations sent from New

Bedford before making payment to Mundial.  Mundial's invoices

contained terms and conditions that differed from those contained

in Softub's purchase orders.

---

[4] As will be explained in further detail later, Softub required a
different version of the Syllent pump for its European spas in
order to conform to the differing requirements of the European
electrical grid.

In May 2008, Softub began assembling spas using the Syllent pump. As a result of regular production line testing during assembly, Softub noticed problems with some newly-delivered Syllent pumps including leaking and cracking. When it noticed problems with a particular unit, Softub would remove the pump for return to and inspection by Mundial. In connection with these early production issues, Zirpolo gave repeated assurances to Softub that "no account should receive units with either cracks or leaks," that Mundial was taking steps to correct the issues, and that "Mundial will do everything humanly possible to make [its] products 'perfect' and totally reliable and thereby, hopefully, regain Softub's confidence."

In addition to the production line failures, Softub began to receive warranty claims from dealers and consumers concerning the Syllent pump as early as August 2008. When Softub reported these continued issues to Mundial and inquired as to whether similar issues had been reported by Mundial, S.A.'s Brazilian customers, Zirpolo responded that the "overall failure rate in Brazil and here is less than 1/10 of 1% so we don't really hear about the whys and wherefores." Zirpolo forwarded Softub's concerns to DeFacci, who expressed his view (to Softub) that Softub's continued issues with the Syllent pump must be its own fault, because "100% of the pumps are leakage tested twice (air & water)

before being packed for shipment," and Mundial, S.A. had not
"see[n] this problem in Brazil or internationally," despite
having thousands of pumps in the field.

Based on input from DeFacci that "[t]here is a big
difference between the typical Bath or Spas application and the
Softub application," Zirpolo suggested that problems with
cracking were likely due to stress caused by Softub's allegedly
unique application.  Despite taking the position that "there is
no inherent defect in the material or workmanship of the covers
that could explain this very random cracking," Zirpolo agreed to
credit Softub for the allegedly defective pumps.  At the same
time, Zirpolo stated that "we are looking to Softub for help" in
resolving the ongoing issues.

In a November 21, 2008 email to Curtis McClurkin of Softub,
DeFacci acknowledged that the reason cracking issues had not
arisen prior to Mundial's relationship with Softub was because
"nobody in [the Syllent pump's] market, before Softub, related
it."  He continued that "[t]he main fact is that this model of
pump was designed and is applied in traditional whirlpool bath
tubs.  In this case, different of the Softub spa, the usual
sequence is: fill the tub / turn on the pump / bath / turn off
the pump / drain the water.  If a damage pump is running then the
leakage stops.  Also, small leakages, are not notice, because the

pump is covered and based on the concrete." DeFacci indicated

the intention on the part of Mundial "to solve all the issues and

to improve the necessar[y] changes," in order that problem-free

operation of the Syllent pump would not be "so dependent [on] the

human factor." Then, on December 9, 2008, Zirpolo wrote to

Softub that "[DeFacci] contends that our latest version — with

the built-in filter — will keep 99.9% of debris away from the

rotor thereby eliminating failures" caused by foreign matter

contacting the rotor. Zirpolo reiterated that "Syllent US and

Syllent SA are as committed as Softub is to making the Syllent

pump work perfectly in the very challenging environment that spas

live in. We will continue to work very hard to attain that

goal."

Throughout its relationship with Softub, Mundial repeatedly

represented that the Syllent pump was suitable for use in spa

tubs. In March 2008, Zirpolo stated that the pump "as it is

currently configured — will run ad infinitum with no problems.

All previously identified 'challenges' of using this whirlpool

pump in spas have been addressed to Softub's and other

manufacturers' satisfaction." He further stated that "[t]he

Syllent pump has been being used virtually problem free in both

spas and baths in Brazil for almost five years; [i]t is a very

high quality piece of technology. We really have a difficult

time understanding this recent round of 'tests' at Softub."  On June 11, 2008, Zirpolo represented that upgraded versions of the pump fitted with a filter "have been running 24x7 in water with various abrasives since Q4 2006 and have yet to show signs of wear.  Life expectancy = very long."

## C.  *Rotor Failures*

According to Softub, during 2008 and 2009, the most common complaint from Softub's customers and dealers was that the Syllent pump would simply stop operating.  Softub opened some of these failed pumps and observed that the rotors had locked-up. Softub returned the failed pumps to Mundial in exchange for credit.

In February of 2009, Mundial communicated to Softub that it had developed a solution to the rotor problem in the form of a new "Rilsan" rotor coating.  In an email dated March 10, 2009, Zirpolo indicated that according to tests performed by DeFacci, the new Rilsan coating "substantially increases the rotor's resistance to high temperatures, chemical attacks and abrasion and, in conjunction with the internal filter, <u>should</u> reduce the failure level exponentially" (emphasis in original).  In April, Mundial's president, Adilson Delatorre, wrote in an email to Ed McGarry of Softub that "[w]e are convinced that the enhancements implemented in these past months, including the new coating

material on the rotors and the new application process will improve the pumps' performance dramatically."

In April 2009, Christian Barning, the principal of Softub's largest worldwide distributor and dealer--Lifepark GmbH in Germany--requested his own meeting with Mundial concerning the unacceptably high failure of rate of the Syllent pump. At the meeting, which occurred at Mundial's Walpole facility, Barning warned Zirpolo and Delatorre that he would urge Softub to discontinue use of the Syllent pump unless the rotor problems and other issues were addressed immediately. Zirpolo responded by reassuring Barning that Mundial was in the process of making improvements to the rotors that would improve the pump's performance dramatically. Shortly thereafter, when Barning visited the Mundial, S.A. headquarters while on vacation in Brazil, DeFacci assured Barning that once spas began shipping with the new Rilsan rotors, he would see a marked improvement in the failure rate. DeFacci also gave Barning several of the new rotors to use as replacements for Lifepark customers.

In order to save money for both Mundial and Softub, in May 2009, Mundial instructed Softub to begin destroying all export pumps for which Softub made warranty claims, as well as all domestic pumps unless the warranty claim resulted from one of a limited number of production line failures or a previously

unreported issue in the field.  Under the new system, Softub would submit a manufactured date code to Mundial for each destroyed unit in exchange for a credit.  Later in the Summer of 2009, Mundial modified its warranty procedure again, requesting that Softub begin returning the end caps of the failed pumps in order to receive credit.  The destroy-in-field process otherwise remained in place, and Zirpolo promised that Mundial would issue any credits prior to physically receiving the end caps.

**D.  *Electrical Failures in Export Pumps***

By July of 2009, Softub had stopped using the Syllent pump in its assembly of new domestic spas, opting instead to resume use of pumps from its pre-Mundial supplier.  Because the export version of the prior pump was much louder than the domestic version, Softub continued to use the Syllent pump in its export spas until it could find a suitable replacement.

Once Softub began to receive export pumps with Rilsan rotors in late Fall 2009 and early 2010, the pump failure rate decreased significantly.  However, as time passed, Softub's export customers began to experience an increasing rate of electrical failures.  These electrical failures where characterized by fuse tripping, high electrical resistance and high amperage, and some failed pumps showed evidence of burning or melting.  When the new issues were brought to DeFacci's attention, he responded that "we

-16-

are working on all the probabilities and performing tests on all the possible[] solutions.  We hope to have the solution asap." Then, during a meeting with Barning in March 2011, DeFacci stated that he had found a solution to the electrical problem, which consisted of putting an insulation layer between the motor windings.  He told Barning this change went into production in October 2010 and that Barning would soon see a drop in the failure rate as a result.

**E.  *Termination of the Relationship***

By an email dated May 23, 2011, Adilson Delattore of Mundial informed Ed McGarry of Softub that due to the continued high failure rate of the Syllent pumps despite the number of improvements that Mundial, S.A. had implemented over the years, Mundial S.A. had ordered Mundial to stop selling pumps to Softub effective August 1, 2011.  Delatorre wrote, "[a]s noted several times over the years, these pumps were designed for use in the typically benign environment of in-home whirlpool baths.  In a nutshell, they cannot withstand the challenges of the 24/7 'spa' world."  Delatorre further informed McGarry that Mundial would no longer issue credits for failed pumps because there would no longer be any new pump orders to offset against, but instead would replace any failed pumps still within the warranty period.

By the time of Delatorre's email, Softub had begun using a new pump in its export spas.

Mundial stopped issuing credits for warranty claims as of September 9, 2011, despite Softub's contention that there were still outstanding invoices against which it deserved to be credited.  On October 11, 2011, Delatorre notified McGarry that Mundial would no longer accept warranty claims (even by replacing pumps) unless the failed pumps were returned to Mundial or otherwise inspected in order for Mundial to determine why the failure rate in Europe was "so disproportionately high."  In a separate email around the same time, Mundial's Dave Hall remarked that the "volume of failures represents a significant dollar amount in credits."  He continued: "I'm not saying that the failures aren't real; I want to insure we aren't getting caught up with a carte blanche, unrestricted process."

In October 2011, DeFacci and Dave Hall met Barning in Germany to examine Lifepark's failed export pumps and investigate how Lifepark documented warranty claims.  Hall confirmed in his deposition that their visit revealed nothing improper about the warranty claims submitted in connection with the failed pumps. Nevertheless, purporting to question the validity of the claims, Mundial provided neither credits nor replacement pumps for the failed Lifepark pumps and has not honored any warranty claims

since September 2011.  In January 2012, Mundial closed the shipping account it had provided to Softub for the purpose of returning end caps in connection with warranty claims.

## F.  *Mundial's Knowledge About Limitations of Syllent Pump*

Allegedly unbeknownst to Softub at the time, Mundial was experiencing significant failure rates of the Syllent pump in other spa applications.  Hall testified in his deposition that as of 2008, Mundial was well aware that one customer, Supersplashpools, Inc. ("Splash"), "experienced problems with the durability of the pump and rotor failures, whether it was identified by debris or whether it was identified by chemical issues."  Between 2007 and 2009, Mundial received complaints from Splash and another customer, Smartub LLC ("Smart"), about "rotors locking or otherwise not operating properly."  By October 2008, Mundial had terminated its relationship with Smart because the failure rate of the Syllent pump in Smart's spa application exceeded twenty percent.  Then, in May 2009, Mundial terminated its relationship with Splash, citing an "extraordinarily high" sixteen percent failure rate that would "only grow as units now in the field fail going forward."

Softub, Splash and Smart were the only spa customers to which Mundial sold the Syllent pump.  Mundial can cite no example where the Syllent pump has performed satisfactorily in any spa

-19-

application, and since the dissolution of its relationship with Softub in 2011, Mundial has not marketed the Syllent pump for use in spa applications.

Because the Softub account was so much larger than both the Splash and Smart accounts, in order to retain Softub as a customer, Mundial attempted to implement several undisclosed, behind-the-scenes improvements to the Syllent pump in addition to the improvements it had communicated to Softub.  In an internal email dated May 14, 2009, Delatorre wrote to Michael Ceitlin, president of Mundial, S.A., to "inform [him] of some serious problems . . . with the Syllent pumps in the American market." Delatorre wrote:

> SPAS – Despite the fact our pump has not been developed specifically for this application, spa manufacturers were the ones who purchased our product the most rapidly, and currently Softub, one of the largest manufacturers in this market, is now our biggest client, with a potential of 10,000 pumps per year.
>
> However, we have had many quality problems, leading us to believe that due to the high number of returns we would unfortunately lose this client, but thanks to the dedication of all those involved (our team here in Walpole and the entire staff in Caxias [Brazil]), it seems that we have gotten a new vote of confidence because of the improvements in the product that were presented, and that everyone hopes the problems we're having will be resolved.
>
> These problems are the result of using the pump in an application for which it was not designed.  Not even Softub's people have full knowledge of the abuse the product is suffering in the field, where there is

overutilization and where it is subject to attacks from chemical products and debris of various kinds such as sand, salt crystals, etc., etc.

We had two options. Abandon a US $1 million/year client that uses the pump in an application for which it wasn't developed, or take on the challenge and adapt the product to take all the abuse it suffers in the field. Thanks to the skills of the technical team involved, the decision was to make a significant investment to keep this business.

. . . .

While this is very expensive, I think the investment is worth it to keep this spa market, which is very big in these countries and in many other countries where we intend to operate.

It's important to clarify that Softub and its distributors have had to shoulder enormous expenses due to these problems, internal costs from quality tests, the freight for returning defective pumps, the labor for replacing pumps., etc., etc., apart from serious problems with their image. Some distributors in the United States and England aren't accepting spas with our pumps anymore (which is a situation we want to reverse).

In mid-2010, approximately one year after Delatorre's letter, Underwriters Laboratories revised the "conditions of acceptability" for the Syllent pump to indicate that the pump was rated for use with a maximum water temperature of 40 degrees Celsius. This revision set the maximum operating temperature below the average 42 degree operating temperature of the Softub spa and well below the 45 degree maximum at which Mundial had rated the pump. The 2005 UL report previously provided to Softub

by Hall indicated that the pumps were suitable for water temperatures common to the spa application, stating that "an increase in water temperature would have minimal effect on the motor winding temperatures." Then, in January 2011, UL added an additional qualification to the temperature specification, which stated: "[t]esting should be considered when pumps are employed in a spa or hot tub."

### G. Softub's Expert Report

In connection with this litigation, Softub retained Harri Kytömaa, Ph.D of the engineering firm Exponent Failure Analysis Associates to analyze the Syllent pump and identify the fundamental cause or causes of its high failure rate. Dr. Kytömaa determined that the design of the Syllent pump is not suitable for the spa environment due to several specific design flaws. Chief among the flaws is the Syllent pump's use of a "water film bearing" rotor design, which is too fragile to tolerate the debris typically found in spa water. His testing showed that debris in the water could easily cause the rotor to seize entirely, or cause increased friction resulting in increased electrical draw and an increased operating temperature. Further, prior to the introduction of the Rilsan rotor coating, the coating of the rotor was not chemically compatible with

chlorinated water and thus degraded over time, causing the rotor to seize.

According to Dr. Kytömaa, the design of the pump seals is also defective for a variety of reasons, the result of which is that water from the wet regions of the pump is allowed to enter the electronics compartment and cause electrical failures.  These defects are exacerbated by the fact that the "potting material" used to encase the electrical components and the motor windings forms internal voids, allowing water to permeate it and reach the electrical components, causing electrical failures.

Dr. Kytömaa identified a number of additional design defects apart from the rotor and seal defects.  The defects identified "either individually or collectively caused the pumps to fail while in use with the Softub spa."  He further noted that with the limited exception of the Rilsan rotor coating and the introduction of the internal filter on the rotor, the design defects exist in all failed pumps and all pumps that remain in the field.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that

a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón* v. *Mills*, 635 F.3d 9, 10 (1st Cir. 2011). However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted). In dealing with cross-motions for summary judgment, I "must view each motion, separately, through this prism." *Estate of Hevia* v. *Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).

## III. DISCUSSION

### A. *Mundial's Motion for Summary Judgment*

Mundial has moved for summary judgment on all counts of Softub's Amended Complaint. Softub opposes summary judgment on the grounds that all counts involve disputes of material fact. Before addressing the parties' arguments with respect to specific counts, however, I must first settle a more fundamental dispute

regarding the character of the parties' alleged contract, around which all claims turn.

### 1.  Terms of Contract

Chief among the many challenges presented by the evidence in this case is that there is no clear written contract governing the parties' relationship.  For the purposes of this litigation, Softub takes the position that its agreement with Mundial is governed by the boilerplate terms and conditions contained in its purchase orders; Mundial takes the same position with respect to the invoices it generated.

While this dispute over the source of the parties' agreement infects all aspects of this litigation, it most directly concerns the scope of any express warranties and the measure of damages to which Softub may be entitled.  Relying on the terms contained in its standard purchase order, Softub argues that Mundial is obligated to indemnify it against all harms causally arising from its sale of defective pumps.  Mundial, on the other hand, contends that the parties contracted to limit Softub's damages to the replacement or credit of defective pumps.  As the record in this case makes clear, however, the parties' course of dealing suggests that they did not intend to be bound by either document.

It is undisputed that Softub placed orders for specified quantities of Syllent pumps using its own standard purchase order

form.  In pertinent part, the terms of sale contained on that

form provided as follows:

>ACCEPTANCE-AGREEMENT Seller's commencement of work on
>the goods subject to this purchase order or shipment of
>such goods whichever occurs first, shall be deemed an
>acceptance of this purchase order. Any acceptance of
>this purchase order is limited to acceptance of the
>express terms contained on the face and back hereof.
>Any proposal for additional or different terms or any
>attempt by Seller to vary in any degree any of the
>terms of this offer in Seller's acceptance is hereby
>objected to and rejected, but such proposals shall not
>operate as a rejection of this offer unless such
>variances are in the terms of the description,
>quantity, price or delivery schedule of goods, but
>shall be deemed a material alteration thereof and this
>offer shall be deemed accepted by Seller without said
>additional or different terms.
>
>. . . .
>
>ENTIRE AGREEMENT The purchase order, and any documents
>referred to on the face hereof, constitute the entire
>agreement between the parties.
>
>. . . .
>
>INDEMNIFICATION Seller shall defend, indemnify and
>[h]old harmless Purchaser against all damages, claims
>or liabilities and expenses (including attorney's fees)
>arising out of any defects in goods or services.
>
>. . . .
>
>WARRANTY Seller expressly warrants that all goods or
>services furnished under this agreement shall conform
>to all specifications and appropriate standards[,] will
>be new, and will be free from defects in material or
>workmanship.

Upon receiving a purchase order from Softub, Mundial would

ship the requested quantity of pumps from its Walpole facility to

Softub's New Bedford facility, and contemporaneously send a
corresponding invoice to Softub's Valencia, California offices.
For orders shipped prior to January 14, 2009,[5] Mundial's invoices
contained the following terms:

> 1. There are no warranties which extend beyond the
> description on the face hereof, and Mundial, Inc.
> (Seller) makes, no warranty, express or implied, of
> merchantability or fitness for a particular purpose,
> use or otherwise with respect to the products, whether
> used singly or in combination with other substances or
> in any process.
>
> . . . .
>
> 3. Any material considered damaged or defective may or
> may not be returned, according to Seller's specific
> instructions. Seller's liability hereunder shall be
> limited to, at Seller's option, either the replacement
> of damaged or defective merchandise or the granting to
> buyer of a credit in the amount of the portion of the
> purchase price paid for damaged or defective
> merchandise. Buyer shall not be entitled to recover any
> consequential or incidental damages arising from any
> breach hereunder.
>
> . . . .
>
> 5. Acceptance of all or part of the material covered
> by this invoice constitutes acceptance of the terms
> hereof by buyer.
>
> 6. This document constitutes the whole agreement
> between the parties, and there are no terms other than
> those contained herein. The terms of this sale may or
> may not be modified or rescinded except by a writing
> signed by buyer and Seller.

---

[5] Mundial's invoices sent after January 14, 2009 did not include
any terms and conditions. Mundial takes the position that by
that time, the parties' course of dealing had established the
substance of their agreement.

The terms contained in Mundial's invoices plainly conflict with the terms contained in Softub's purchase orders.  This case therefore presents a classic "'battle of the forms' sale, in which a buyer and a seller each attempt to consummate a commercial transaction through the exchange of self-serving preprinted forms that clash, and contradict each other, on both material and minor terms."  *Commerce & Indus. Ins.* v. *Bayer Corp.,* 742 N.E.2d 567, 571 (Mass. 2001).  Section 2-207 of the UCC, enacted at Mass. Gen. Laws ch. 106, § 2-207, governs such a sale.[6]  It provides as follows:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional or different terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>> (a) the offer expressly limits acceptance to the terms of the offer;
>>
>> (b) they materially alter it; or

---

[6] It is undisputed that the contract between Softub and Mundial is a contract for the sale of goods governed by Article 2 of the Uniform Commercial Code.

> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

Mass. Gen. Laws ch. 106, § 2-207. The question thus becomes whether Mundial's acceptance was "expressly made conditional on assent to the additional or different terms," and as a result, whether the parties' contract is governed by subsection (2) or subsection (3) of § 2-207. *See Ionics, Inc.* v. *Elmwood Sensors, Inc.*, 110 F.3d 184, 187 (1st Cir. 1997).

Here, paragraph 5 of Mundial's Invoice provides that *Softub's* acceptance of Mundial's *shipment* constitutes an acceptance of what is, essentially, Mundial's counteroffer, but nothing in Mundial's invoice conditions *its* acceptance of Softub's offer on Softub's assent to the additional or different terms in Mundial's invoice. Therefore, based on the plain language of § 2-207, it would appear that a contract is formed under subsection (1), subject to the conditions set forth in subsection (2). Mass. Gen. Laws ch. 106, § 2-207(1); *JOM, Inc.* v. *Adell Plastics, Inc.*, 193 F.3d 47, 53 (1st Cir. 1999) ("[I]f

the parties exchange forms with divergent terms, yet the seller's invoice does not state that its acceptance is made 'expressly conditional' on the buyer's assent to any additional or different terms in the invoice, a contract is formed [under subsection (1) of § 2-207].").

Nevertheless, both the Supreme Judicial Court of Massachusetts and the First Circuit have recognized that even if a seller's invoice does not condition acceptance on assent to its additional or different terms, an exchange of forms will still fail to result in contract where the buyer "by means of language in . . . its purchase orders, expressly limit[s] [the seller's] acceptance to the terms of [the buyer's] offer." *Commerce & Indus. Ins.*, 742 N.E.2d at 572; *JOM, Inc.*, 193 F.3d at 54; *see also Ionics, Inc.*, 110 F.3d at 189 (where "notification of objection to conflicting terms was given on the order form and . . . the new terms materially alter those in the offer," contract cannot be formed under subsection (1) of § 2-207). That is the case here, where Softub's purchase order expressly limited Mundial's acceptance to the terms of its offer.

However, "where for any reason the exchange of forms does not result in contract formation[,] . . . a contract is nonetheless formed' [under subsection (3) of § 2-207] if [the parties'] subsequent conduct—for instance, the seller ships, and

the buyer accepts the goods—demonstrates that the parties believed that a binding agreement had been formed." *Commerce & Indus. Ins.*, 742 N.E.2d at 572 (quoting *JOM, Inc.*, 193 F.3d at 54) (modification in original). I therefore find that the contract between Softub and Mundial was created under subsection (3) of § 2-207, and its terms "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of [UCC Article 2]." Mass. Gen. Laws. ch\. 106, § 2-207(3).[7]

---

[7] Although the First Circuit in *Ionics* relied on Official Comment 6 to § 2-207 in holding that subsection (3) applied "where the terms in the two forms are contradictory," the text of Comment 6 suggests such a scenario would actually fall within subsection (2), with each conflicting term constituting a notification of objection:

> Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2).

Mass. Gen. Laws. ch. 106, § 2-207, Official Comment 6. In the circumstances of the present case, where the terms of the forms not only conflict, but where Softub's purchase order expressly limits Mundial's acceptance to the terms of its offer, the SJC has made clear that a contract can only be formed under subsection (3), if at all. *See Commerce & Indus. Ins.*, 742 N.E.2d at 572. Moreover, because subsection (3) still looks, in part, to "terms on which the writings of the parties agree," it is immaterial in the circumstances of this case—where the

Here, because the respective forms of Softub and Mundial
agree on virtually nothing material to the present dispute, the
contract consists primarily of UCC "gap-fillers," *see generally,
JOM, Inc.*, 193 F.3d 47, which "include those that may be
established by a course of dealing, course of performance, and
usage of the trade." *Commerce & Indus. Ins.,* 742 N.E.2d at 573
(quoting 2 R.A. Anderson, Uniform Commercial Code § 2-207:78, at
602 (3d ed. rev. 1997)). As a result, summary judgment is
appropriate as to so much of Softub's claims as are premised
solely on terms found only in its purchase orders.[8]

---

parties' writings conflict on virtually every subject—whether a
contract is said to be formed under subsection (1), subject to
the exclusion of all conflicting terms by operation of subsection
(2)(c), or whether a contract is formed under subsection (3)
based on the conduct of the parties, incorporating any terms on
which the parties' writings agree.

[8] This category consists principally of Softub's claims alleging
a contractual breach of the duty to indemnify. Although Mundial
represents that it has not moved for summary judgment on Softub's
indemnity claims, at the same time, it variously argues that its
liability is limited to replacement or credit for defective
product and that "Softub did not articulate a legal theory
providing a basis for indemnification." In any event, because
Softub has not identified a source of Mundial's alleged indemnity
obligation outside of its inoperative purchase orders, I conclude
that Mundial is entitled to summary judgment on those claims.
*Cf. Bank* v. *Int'l Bus. Machines Corp.*, 145 F.3d 420, 431 (1st
Cir. 1998).

## 2. <u>Warranty and Contract Claims</u>

At the heart of this case are Softub's claims for breach of warranties both express and implied.[9]

### a. *Express Warranty*

Count V of the Amended Complaint asserts a claim for breach of express warranties under UCC § 2-313.  That section provides in relevant part that:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Mass. Gen. Laws. ch. 106, § 2-313(1).  For an affirmation or description to be actionable as an express warranty, it must have become "part of the basis of the bargain."  *Id.*  "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation

_____

[9] Softub's claims for breach of contract (Counts III and VIII) and breach of the implied covenant of good faith and fair dealing (Counts IV and IX) are virtually indistinguishable from its claim for breach of express warranties.  Each claim is premised on Softub's alleged failure to deliver pumps that were suitable for Softub's intended use and free from defects, and subsequent failure to honor warranties.  Consequently, I will discuss the contract claims no further except to note for present purposes they rise or fall on the express and implied warranty claims.

merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.* at § 2-313(2).

In the Amended Complaint, Softub alleges the following express warranties: (1) that the Syllent pumps would meet Softub's specifications; (2) that the pumps were suitable for Softub's intended use; (3) that the pumps would operate under normal spa conditions for the applicable warranty period of two, three, or five years; and (4) that the pumps would be otherwise free from defects.

Mundial essentially argues that summary judgment should enter with respect to all express warranties asserted by Softub because those alleged warranties are either found in Softub's purchase order, which is inoperative, or are not found anywhere in the summary judgment record in the exact language used in the Amended Complaint. Apart from arguing that the language of its purchase order controls, Softub responds that summary judgment is inappropriate because a jury evaluating the universe of statements made by Mundial would be entitled to conclude that Mundial expressly warranted that the Syllent pump was suitable for normal spa use and specifically for Softub's application.

Apart from its "battle of the forms" argument—which, as discussed in Part III.A.1, *supra,* I agree renders inoperative any

express warranties contained in Softub's purchase orders—Mundial offers no developed legal argument as to why, in the absence of an integrated agreement, at least *some* of the various affirmations it made over the course of the parties' dealings cannot be construed as express warranties that the Syllent pump was suited for use in Softub's spas (and perhaps to spas generally).[10]  Under Massachusetts law, "[t]o create an express warranty, the word warrant need not be used, nor is any precise form of expression necessary; but . . . if the vendor, at the time of the sale, affirms a fact, as to the essential qualities of his goods, in clear and definite language, and the purchaser buys on the faith of such affirmation, that . . . is an express warranty." *O'Connell* v. *Kennedy*, 101 N.E.2d 892, 894 (Mass. 1951)

---

[10] As reflected in Softub's Answers to Interrogatories 18 & 19, two of the express warranties alleged in the Amended Complaint—that the pumps were suitable for Softub's intended use and that they would operate under normal spa conditions—are not found in a single integrated agreement (indeed, none exists), but are instead derived from a collection of fifty-eight statements made by Mundial representatives to Softub representatives between 2005 and 2011.  Mundial argues that because these two alleged express warranties are not found *verbatim* among those fifty-eight statements, summary judgment must be granted as to those warranties.  I disagree.  Mundial cites no authority to support the proposition that a plaintiff must plead verbatim any express warranties.  Among the fifty-eight statements identified by Softub, some of which are reproduced in the background section of this memorandum, are a number of statements in which Mundial expressly represented to Softub that the Syllent pump was suitable for use in its spa application.

(internal quotation marks omitted); *see also Glyptal*, 801 F.
Supp. at 896-97 (concluding genuine issues of material fact
regarding content of conversation between buyer and seller
precluded summary judgment on express warranty claim, even where
buyer did not allege specific warranty language).

     *b. Implied Warranty*

     Count VI of the Amended Complaint alleges breaches by
Mundial of the implied warranties of fitness for a particular
purpose and merchantability.  Mundial moves for summary judgment
with respect to both implied warranties.

     i.  <u>Fitness for a Particular Purpose</u>.  Under UCC § 2-315,
"[w]here the seller at the time of contracting has reason to know
any particular purpose for which the goods are required and that
the buyer is relying on the seller's skill or judgment to select
or furnish suitable goods, there is unless excluded or modified .
. . an implied warranty that the goods shall be fit for such
purpose."  Mass. Gen. Laws. ch. 106, § 2-315.  The creation of
such a warranty requires proof of three factual elements:

> First, the seller must have reason to know of the particular
> purpose for which the buyer requires the goods; second, the
> seller must have reason to know that the buyer is relying on
> the seller's skill or judgment in selecting or furnishing
> suitable goods; and third, the buyer in fact must rely upon
> the seller's skill or judgment.

*Glyptal, Inc.* v. *Engelhard Corp.*, 801 F. Supp. 887, 897-98 (D. Mass. 1992); *Fernandes* v. *Union Bookbinding Co.*, 507 N.E.2d 728, 733 (Mass. 1987). "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." *Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 434 N.E.2d 611, 616 (Mass. 1982) (quoting U.C.C. § 2-315 Comment 2).[11]

Mundial argues that no reasonable jury could conclude that Softub relied on Mundial's knowledge, skill or judgment to select of furnish pumps suitable for Softub's application, essentially because Softub's knowledge of spa design and manufacture is superior to its own, and because Softub performed its own testing of the Syllent pump in its application prior to its initial decision to purchase.

The record contains evidence of a factual dispute surrounding this issue sufficient to render summary judgment

---

[11] Although it is unclear from the record if Softub appreciated at the time it initially engaged with Mundial that the Syllent pump was not originally designed for use in spas, consistent with its litigation strategy, Mundial does not contest that Softub's spa use qualifies as a "particular purpose" under § 2-315.

inappropriate.  There is no doubt that Softub's knowledge of the requirements of its particular spa application was superior to Mundial's, and that Softub tested the Syllent pump in its spas prior to making the decision to purchase.  Where a buyer has performed its own testing prior to making the decision to purchase a product, courts often hold the implied warranty of fitness for a particular purpose inapplicable due to lack of reliance.  *See Glyptal Inc.,* 801 F. Supp. at 898; *Trans-Aire Inter., Inc.* v. *Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1258-59 (7th Cir. 1989); *Dow Corning Corp.* v. *Weather Shield Mfg., Inc.*, 790 F. Supp. 2d 604, 615 (E.D. Mich. 2011).

Here, however, the totality of the record suggests that the problem related to using the Syllent pump in a spa (as opposed to whirlpool) application related to its fundamental lack of durability, which in many cases was due to latent defects that only manifested themselves once the product was in the hands of the consumer.[12]  A reasonable jury could conclude, in contrast,

_____

[12] For this reason, I am not persuaded by Mundial's invocation of UCC § 2-316(3)(b), which provides that "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him . . . ."  Mass. Gen. Laws. ch. 106 § 2-316(3)(b).  Due to the latent nature of many of the alleged defects as well as the fact that Mundial allegedly withheld information regarding the Syllent pump's failure rate in other spa applications, a jury could conclude that Softub's examination of the pumps was not one which

that Softub's testing was focused on the Syllent pump's ability to meet Softub's performance specifications in terms of heating capacity and noise level, among other functions. When issues arose during Softub's initial testing, and then later during production, Mundial repeatedly represented to Softub that it was making necessary improvements to the pump and that longevity and durability would not be a problem going forward. Mundial, not Softub, was always responsible for devising and implementing solutions to the various issues that Softub reported. Mundial thus had reason to know that Softub was relying on its skill and knowledge both in vouching for the initial suitability of the pump and in implementing later improvements which it assured Softub would render the pump suitable for Softub's application. On balance, I find that there is sufficient evidence to permit a jury to consider whether the Syllent pump carried an implied warranty of fitness for the particular purpose of functioning in the spa environment.

    ii. <u>Merchantability</u>. Where, as here, the seller of goods is a merchant with respect to goods of the kind, the sale creates an implied warranty that the goods are "merchantable," unless

---

"ought in the circumstances to have revealed" many of the defects. Moreover, when Softub's examination of a new shipment of pumps revealed patent defects, such as visible cracks, etc., it brought those defects to Mundial's attention.

such a warranty is excluded or modified.  Mass. Gen. Laws ch.
106, § 2-314(1).  Goods are considered "merchantable," if they,
among other things: "(c) are fit for the ordinary purposes for
which such goods are used; . . . and (f) conform to the promises
or affirmations of fact made on the container or label if any."
*Id.* § 2-314(2).

   Contrasting the pump's relatively low failure rate in
whirlpool bath application with the substantially higher failure
rates experienced in Softub's spas, Mundial argues that no
reasonable jury could find that the Syllent pump is not fit for
the ordinary purpose for which it was designed.  Mundial also
points to the fact that the pump was approved for use by
Underwriters Laboratories, as well as the fact that Softub used
the pump in the manufacture of its export spas for a period of
three years as evidence of its fitness for ordinary purposes.

   Yet, while Mundial later took the position upon terminating
its relationship with Softub that the Syllent pump was never
designed for use in spas and "cannot withstand the challenges of
the 24/7 'spa' world," the pumps sold to Softub were affixed with
labels stating the pumps were "[f]or use with Hot Tubs and Spas
only," and accompanied by manuals touting the pumps' suitability
for use in spas.  There is also evidence that Mundial sold the
Syllent pump to at least two other spa manufacturers, only to

terminate sales when the failure rate in those spa applications proved to be unacceptably high. There is therefore at least some evidence that Softub's use constituted an "ordinary" use of the Syllent pump as marketed by Mundial. If a jury evaluating this evidence were to find that Softub's spa use constituted an ordinary use, and also credited the substantial evidence of the pump's unacceptably high failure rate in Softub spas, Softub could prevail on its claim for breach of the implied warranty of merchantability.[13]

### 3. Misrepresentation Claims

Softub asserts claims for both intentional (Count I) and negligent misrepresentation (Count II) based on a variety of statements made by Mundial, the general tenor of which was that the Syllent pump was suitable for use in a spa application. Mundial moves for summary judgment on these claims essentially on the grounds that they are not pled with adequate particularity or that there is insufficient evidence to create a genuine factual dispute as to each element of both claims.

---

[13] Presumably, Softub's use cannot be both "particular," as is required to trigger the implied warranty of fitness for a particular purpose, and ordinary, as to trigger the implied warranty of merchantability. However, the evidence in the record would allow a reasonable jury to choose either alternative. Accordingly, I decline to enter summary judgment on Softub's claim for breach of the implied warranty of merchantability.

In an action for intentional misrepresentation, or deceit, under Massachusetts law, such as that alleged in Count I, a "plaintiff must prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Danca* v. *Taunton Sav. Bank*, 429 N.E.2d 1129, 1133 (Mass. 1982) (internal quotations omitted). An intentional misrepresentation may result from an implied or express representation. *Briggs* v. *Carol Cars, Inc.*, 553 N.E.2d 930, 933 (Mass. 1990). Proof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge. *Cummings* v. *HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001); *Snyder* v. *Sperry and Hutchinson Co.,* 333 N.E.2d 421, 428 (Mass. 1975).

By contrast, in order to prevail on a claim of negligent misrepresentation such as that alleged in Count II, a plaintiff must prove only that a defendant provided it with false information and "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." *Nota Constr. Corp.* v. *Keyes Assoc.*, 694 N.E.2d 401, 405 (Mass. App. 1998). A statement giving rise to liability for misrepresentation must be one of fact, i.e., something

"susceptible of knowledge," rather than one of expectation, estimate, opinion, or judgment. *Zimmerman* v. *Kent*, 575 N.E.2d 70, 75 (Mass. App. 1991). Nevertheless, while statements of opinion cannot give rise to an action for intentional or negligent misrepresentation, "a statement that in form is one of opinion 'may constitute a statement of fact if it may reasonably be understood by the recipient as implying there are facts to justify the opinion or at least that there are no facts that are incompatible with it." *Cummings*, 244 F.3d at 22 (quoting *McEneaney* v. *Chestnut Hill Realty Corp.*, 650 N.E.2d 93, 96 (Mass. App. 1995)).

Mundial's principal challenge to Softub's claims of misrepresentation is that they are not pled with the particularity required under Fed. R. Civ. P. 9(b) for pleading allegations of fraud. The argument is ill-founded. Softub's Amended Complaint, and importantly, the record developed at this stage, contain numerous specific examples of statements which a reasonable jury could find to be intentional misrepresentations designed to induce Softub to purchase and continue using the Syllent pump. These statements include Dave Hall's November 1, 2005 representation that the Syllent pump "is proven to operate in conditions of like use with your product"; Rich Zirpolo's September 15, 2008 representation that the overall failure rate

of the Syllent pump was "less than 1/10 of 1% so we don't really hear about the whys and wherefores"; Zirpolo's December 9, 2008 statement that the latest version of the pump, with the built-in filter, would "keep 99.9% of debris away from the rotor thereby eliminating failures"; and Zirpolo's March 2008 representations that the pump "as it is currently configured — will run ad infinitum with no problems"; that "[a]ll previously identified 'challenges' of using this whirlpool pump in spas have been addressed to . . . other manufacturers' satisfaction"; and that "[t]he Syllent pump has been being used virtually problem free in both spas and baths in Brazil for almost five years."

While some of those statements are inflected with opinion, they all imply underlying facts that Softub alleges Mundial knew were false, *see Cummings*, 244 F.3d at 22, namely that the pump had been successfully used in spa applications, had a low failure rate even in spa applications, and was generally suitable for use in spas. As is evidenced by the depositions of Dave Hall both in his individual capacity and as Mundial's 30(b)(6) representative, Mundial has yet to substantiate its claims that the Syllent pump was ever successfully used in a spa application.

The problem Softub faces, however, is that the vast majority the misrepresentations it alleges, including all of the most damning statements recounted above, are barred by Massachusetts'

three year statute of limitations for misrepresentation claims.
*See* Mass. Gen Law. Ch. 260, § 2A.  Unless an exception to the
statute of limitations applies, Softub is not permitted to
recover for any misrepresentation which occurred prior to April
6, 2009, three years prior to the filing of this action.

Having reviewed each alleged misrepresentation made after
the April 6, 2009 cutoff date, I fail to see how a reasonable
jury could find them to constitute actionable misrepresentations,
intentional or otherwise.  In contrast to many of the
representations made by Mundial representatives prior to April 6,
2009, the alleged misrepresentations made after this date are all
either demonstrably true on this record, or are plainly
statements of "expectation, estimate, opinion, or judgment,"
*Zimmerman*, 575 N.E.2d at 75, regarding improvements in
performance Softub could expect to see following the
implementation of various design improvements.[14]  As a

---

[14] I have carefully reviewed Softub's response to my inquires
(#240) regarding the post-April 6, 2009 statements it contends
contain misrepresentations.  To the degree the evidence supports
that such representations were made to Softub and not to third
parties, Softub has not pointed to any evidence from which a jury
could find that these statements were false at the time Mundial
made them.  Although such statements may be considered in
conjunction with Softub's express warranty claim, they cannot
constitute factual misrepresentations absent some evidence, of
which there is none, that Mundial never intended to honor the
applicable warranties.  *See Ernest F. Carlson Co. v. Fred T. Ley
& Co.*, 168 N.E. 812, 814 (Mass. 1929) (internal quotation
omitted) ("A statement promissory in nature is not properly a

consequence, summary judgment is appropriate with respect to the misrepresentation claims alleged in Counts I and II.  I note however that with the exception of the November 1, 2005 representation by Dave Hall, the remainder of the statements recounted herein may be considered in conjunction with Softub's claim for breach of express warranties, which carries the four year statute of limitations period generally applicable to actions on contracts for the sale of goods.  *See* Mass. Gen. Laws. ch. 106, § 2-725(1).

Softub argues that there exists a material question of fact as to whether the misrepresentations it alleges concern facts that were "inherently unknowable" to it, such that the "discovery rule" might apply to toll the statute of limitations until it "knew, or in the exercise of reasonable diligence should have known, of the factual basis for [its] cause of action."  *See Patsos* v. *First Albany Corp.*, 741 N.E.2d 841, 846 Mass. 2001); *see also* Mass. Gen. Laws ch. 260, § 12; *Salvas* v. *Wal-Mart Stores, Inc.*, 893 N.E.2d 1187, 1217 (Mass. 2008) (statute of limitations is tolled where defendant "fraudulently conceals" a cause of action from the knowledge of a plaintiff).  Essentially, Softub contends that it did not have reason to know that

---

representation, but a contract[,]" and therefore does not sound in tort unless deceit is alleged).

Mundial's statements about the Syllent pump's suitability for use in spas were untrue until Adilson Delattore's May 2011 email which finally admitted that the Syllent pump was never intended to be used in spa applications and was unsuitable for that purpose.

I disagree.  Where a party invokes the discovery rule in an attempt to toll a statute of limitations, "the factual inquiry focuses on . . . the first event reasonably likely to put the plaintiff on notice that the defendant's conduct had caused him injury."  *Szymanski* v. *Boston Mut. Life Ins. Co.*, 778 N.E.2d 16, 20 (Mass. App. 2002).  Here, Softub clearly had reason to believe from early on in its relationship with Mundial that Mundial's representations about the quality of its product and its suitability for Softub's purposes were not to be trusted.[15] While Softub might have filed suit earlier, it chose to attempt to salvage a commercial relationship in which it had invested

---

[15] It was in Fall 2008 that Mundial first took the position that the problems Softub was experiencing with the Syllent pump were its own fault, citing the overall failure rate of the pump in Brazil as "1/10 of 1%," which was dramatically lower than the failure rate experienced by Softub.  Moreover, on November 21, 2008, Ricardo DeFacci wrote to Softub's Curtis McClurkin that "[t]he main fact is that this model of pump was designed and is applied in traditional whirlpool bath tubs."  That statement alone, which directly contradicted previous representations made by Mundial representatives concerning the pump's design and suitability for spa tubs, reasonably put Softub on notice that Mundial had engaged in some form of misrepresentation.

substantial time and resources.  As a result, Softub relinquished its right to assert misrepresentation claims that otherwise would have been actionable.

### 4.  Chapter 93A Claims (Counts VII and X)

Mundial attacks Softub's Chapter 93A claim on the grounds that the alleged deceptive acts forming the basis of that claim did not occur "primarily and substantially" within Massachusetts. *See* Mass. Gen. Laws ch. 93A, § 11.

Although the First Circuit has in the past traditionally employed a three-part test that looks to (1) where the defendant commits the unfair or deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained the losses caused by the wrongful conduct, *see Play Time, Inc.* v. *LDDS Metromedia Communications, Inc.*, 123 F.3d 23, 33 (1st Cir. 1997); *Roche* v. *Royal Bank*, 109 F.3d 820, 829, 831 (1st Cir. 1997); *Clinton Hosp. Ass'n* v. *Corson Group, Inc.*, 907 F.2d 1260, 1265-66 (1st Cir. 1990), the Supreme Judicial Court, the ultimate expositor of Massachusetts law, has since rejected reliance on any particular factor or factors in favor of an inquiry aimed at "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  *Kuwaiti Danish Computer Corp.* v. *Digital Equip. Co.*, 781 N.E.2d 787, 799 (Mass. 2003).

The First Circuit, for its part, has now "acknowledged this modification in Massachusetts law," but has observed that "*Kuwaiti Danish* did not retreat from the proposition that, if the significant contacts of the competing jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." *Uncle Henry's Inc.* v. *Plaut Consulting Co., Inc.*, 399 F.3d 33, 44 (1st Cir. 2005).

In essence, Count VII is based on Mundial's alleged misrepresentations and use of false assurances to "string along" Softub despite the unsuitability of the Syllent pump for Softub's spas, as well as Mundial's alleged bad faith denial of warranty credits upon the termination of the parties' relationship.[16]

To be sure, Mundial is headquartered in Walpole, Massachusetts, the majority of the misrepresentations alleged were made by Mundial executives based in Walpole, and the pumps that Softub purchased as a result of these misrepresentations were shipped from Walpole to Softub's New Bedford, Massachusetts facility for installation in Softub's spas. In addition, at least some of the alleged misrepresentations were made at various meetings that occurred in Massachusetts. On the other hand, the

---

[16] Count X is premised on Mundial's refusal to honor an indemnity obligation which I have already held to be inapplicable. *See supra* note 8.

majority of Softub's corporate decision-makers worked out of their Valencia, California facility, where they apparently received and acted on Mundial's alleged misrepresentations. Moreover, because the four year statute of limitations for Chapter 93A claims bars claims arising from deceptive conduct that occurred prior to April 6, 2008, the bulk of the misrepresentations potentially actionable under Chapter 93A affected only Softub's export spas, and therefore their impact was felt primarily in Europe (in addition to California). This is therefore a case where "significant contacts of the competing jurisdictions are approximately in the balance," and as a result, "the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." *See Uncle Henry's Inc.*, 399 F.3d at 44. Accordingly, summary judgment will enter on Softub's Chapter 93A claims.

### 5. Defenses Common to Multiple Counts

Mundial raises a number of defenses which it contends are common to multiple counts or generally serve to limit its liability to Softub. I will address each in turn.

#### a. *Failure to Mitigate Damages*

First, Mundial argues as a general matter that it is not liable for consequential damages stemming from pumps purchased by Softub after July 2009, when Softub decided that the Syllent pump

was failing so frequently that it ceased using it in the manufacture of its domestic spas. Of the approximately 15,000 Syllent pumps purchased by Softub between 2008 and 2011, nearly half were purchased for the export market after July 2009. Softub responds that it ceased using the Syllent pump for its domestic spas once it found a suitable alternative. It argues that in the case of the export spas, it decided to keep using the Syllent pump for an additional two years both because it had not yet found a suitable replacement that met the European market's demand for quiet operation, and because Mundial had reassured its European dealers that improvements to the pump would substantially decrease the failure rate.

There can be no genuine dispute that Softub continued purchasing Syllent pumps for the export market despite knowing that they were failing at an unacceptably high rate. Softub's entire complaint is premised on the allegation that the Syllent pump never performed acceptably despite the many improvements Mundial purported to implement. The question then is whether Softub's decision to continue purchasing and using the Syllent pump for its export spas after July 2009 constituted an unreasonable failure to mitigate damages.

Mundial invokes the general principle that "a party cannot recover for harms that its own reasonable precautions would have

avoided." *Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 204-05 (1st Cir. 1995). In other words, "[t]o recover lost profits, the plaintiff must show by a preponderance of the evidence that the actionable breach caused the loss and that the loss was foreseeable and calculable with reasonable certainty." *Id.* at 204 (citing *Matsushita Elec. Corp.* v. *Somnus Corp.*, 284 N.E.2d 880, 890 (1972)); *see* Mass. Gen. Laws ch. 106, § 2-715(2)(a) (consequential damages include only those losses "which could not reasonably be prevented by cover or otherwise"). Relying principally on *Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, Mundial argues that Softub cannot recover damages when it "could have minimized the damage through reasonable diligence by increasing its inspections and, to the extent needed, finding alternative suppliers." *Id.* at 204.

The plaintiff in *Knapp* was a shoe wholesaler and retailer who contracted to purchase work shoes manufactured by the defendant for sale under its own brand name. *Id.* at 193. In affirming the trial judge's decision not to award lost profits following a jury-waived trial on damages, the First Circuit observed that the plaintiff had failed to mitigate its damages by accepting shipments that it knew were likely to contain defective shoes because it "did not show that it had an urgent need for any

of [the] inventory, nor justify its failure to obtain alternative sources given its knowledge of persisting problems." *Id.* at 204.

While Mundial ironically makes a compelling argument that Softub should have given up on the Syllent pump far sooner than it did, even the cases to which Mundial cites recognize the inherently factual nature of the mitigation inquiry, which depends on the reasonableness of the plaintiff's efforts in light of the situation it faced. In neither *Knapp* nor *Matushita* was summary judgment granted on mitigation grounds. *See Knapp*, 72 F.3d 190; *Matushita,* 284 N.E.2d 880. And while the First Circuit in *Knapp* affirmed that court's decision not to award consequential damages, it commented on the closeness of the evidence, based in part on the plaintiff's evidence at trial that it had an "urgent need" for some of the inventory in question. *See Knapp*, 72 F.3d at 204. Here, given the evidence that Softub switched pump suppliers for its domestic and export spas at different times based on varying considerations between the two markets, as well as the evidence that Mundial continued to reassure Softub's European distributors that the Syllent pump's issues would soon be resolved, it would be inappropriate to grant summary judgment on the issue of mitigation.

*b. Improper Use of Pump by Softub*

Mundial alleges that the manner in which Softub incorporated the Syllent pump into its spas overrode a safety feature in the pump and that "this alteration to and misuse of the pump terminates Softub's warranty claims and all claims of this lawsuit." Mundial's allegation is based primarily on the report of its expert, Donald J. Hoffman, Ph.D, which it commissioned for use in this litigation. Not surprisingly, Softub's expert, Dr. Kytömaa, reached the exact opposite conclusion. This issue is plainly inappropriate for resolution on summary judgment.

*c. Economic Loss Doctrine*

Mundial argues that the economic loss doctrine bars recovery to the extent that Softub's claims are based in tort. While Mundial is correct that Softub seeks only economic damages, and that the economic loss doctrine bars the recovery of economic damages in tort actions, Mundial is mistaken regarding the scope of the doctrine's application to this case. Softub's only tort-based claims are those for intentional and negligent misrepresentation, and so much of its Chapter 93A claim that stems from those alleged misrepresentations. Claims for intentional and negligent misrepresentation are not governed by the economic loss doctrine. *See Canal Elec. Co.* v. *Westinghouse Elec. Co.*, 973 F.2d 988, 998 (1st Cir. 1992) (economic loss

doctrine does not apply to intentional torts); *Passatempo* v.
*McMenimen*, 960 N.E.2d 275, 295 (Mass. 2012) (quoting *Nota Constr.*
*v. Keyes Assocs., Inc.*, 694 N.E.2d 401, 405 n.1 (Mass. App.
1998)) (economic loss doctrine does not apply to "pecuniary loss
incurred as a result of an actionable misrepresentation,"
including as a result of negligence).  As a general proposition,
of course, warranty claims can sound in either contract or tort
depending on the existence of privity between the parties and the
nature of the injury claimed, *see Jacobs* v. *Yamaha Motor* Corp.,
649 N.E. 2d 758, 762-63 (Mass. 1995); Bay *State Spray &*
*Provincetown Steamship, Inc.* v. *Caterpillar Tractor Co.*, 533
N.E.2d 1350, 1352-54 (Mass. 1989); *Sebago, Inc*. v. *Beazer East,*
*Inc.*, 18 F. Supp. 2d 70, 89-90 (D. Mass. 1998); *W.R. Constr. &*
*Consulting Inc.* v. *Jeld-Wen, Inc.*, 2002 WL 31194870 at *6-7 (D.
Mass. Sept. 20, 2002).  Softub's privity-based warranty claims
here are clearly contract-based.  The economic loss doctrine
therefore does not apply to this case.

**B.   *Softub's Motion for Summary Judgment***

     Softub has moved for summary judgment on Count I of
Mundial's counterclaims, which alleges a violation of Chapter
93A.  Mundial asserts two primary bases for this claim: First,
that Softub submitted fraudulent warranty claims because it did
not notify Mundial "that its wiring of the pumps could have been

the source of the pumps' failures;" and second, that it engaged
in unlawful deception when Ed McGarry represented in July 2010
that Softub would resume purchasing Syllent pumps for the
domestic market in the fourth quarter of 2010, which
representation Mundial alleges was falsely made in order to
induce Mundial to issue warranty credits which it had been
withholding.

Even if there were merit to Mundial's claims, a matter I
need not decide, they must be dismissed for the same reason that
I must dismiss Softub's Chapter 93A claims.  The alleged
deceptions did not occur "primarily and substantially" in
Massachusetts.  Although Softub has not argued this ground in its
motion for summary judgment, presumably in an effort to
demonstrate consistency with its own Chapter 93A claim, I see no
material distinction in the geographic dimensions between the
Chapter 93A claims of Softub and those of Mundial.  The parties
thus have had an ample opportunity in the summary judgment
practice before me to explain their understanding of the
"primarily and substantially in Massachusetts" limitation on
Chapter 93A claims.  "Sua sponte" grant of summary judgment on
this issue is appropriate.  *See Bank* v. *Int'l Bus. Machines
Corp.*, 145 F.3d at 431.

## IV. DISCOVERY MOTIONS

Both parties have filed motions to strike relevant evidence on the basis of various alleged discovery violations. Although as a categorical matter I perceive their various protestations to be nothing more than formalistic and groundless attempts to avoid a decision on the merits of the case, I will briefly explain why each is denied.

### A. *Mundial's Motions to Strike (Dkt. 154, 188, 189, 191)*

#### 1. Dkt. 154, 188

First up is a motion filed by Mundial captioned "Defendant's Motion to Strike Softub's Late Answer to Interrogatory Regarding Identification of 'Specifications' and to Strike Later Allegation in Amended Complaint with New 'Specification' and to Preclude Plaintiff from Pursuing Claims Based on, or Otherwise Using, the Late-Disclosed Specifications." Through this motion, Mundial asks me to exercise my discretion under Fed. R. Civ. P. 37(c)(1) essentially to preclude Softub from relying on "specifications" for the Syllent pump which Softub contends were incorporated by reference into its agreement with Mundial, on the ground that Softub produced these specifications late in discovery. Softub responds that it produced the specifications in a supplementary response to an interrogatory well within the deadline for written discovery, and that Mundial has failed to cite a single case

where information disclosed during discovery was stricken as untimely.

Putting the merits of Mundial's challenge aside, my conclusion that the terms contained in Softub's purchase order do not constitute part of the contract between the parties substantially moots the controversy over Softub's allegedly belated disclosure of its "specifications," because only through application of the terms of the purchase order could Softub's specifications become expressly incorporated into the contract. Any continuing role of the "specifications" in this litigation is therefore merely to serve as some evidence—subject to admissibility at trial—of what Mundial knew Softub's expectations to be. Most of the "specifications" in question are either not at issue—in the sense that it is undisputed that Syllent pump complied with them—or are simply reiterations of the general allegation that Mundial contracted to supply a pump that was suitable for Softub's application. They do not contain a smoking gun, and nothing about the circumstances of their production suggests that Mundial suffered the degree of prejudice that would warrant striking them from the record. Mundial's motion will be denied.

2.  Dkt. 189

Next up is a motion by Mundial to strike the Affidavit of
Christian Barning on the grounds that it contradicts his earlier
deposition testimony and consequently should be stricken under
the "sham affidavit" doctrine.  *See Colantuoni* v. *Alfred Calcagni
& Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).  Mundial also
argues that Softub "concealed" Mr. Barning by not listing him in
its Automatic Disclosure, and that the Affidavit contains
inadmissible hearsay.  The arguments are wide of the mark.

A comparison of the entirety of Barning's deposition
testimony with his Affidavit demonstrates some minor differences
in narrative, but no inherent conflict in substance that could be
considered "clearly contradictory," as is required to trigger the
sham affidavit doctrine.  *See id.*  To the extent Mr. Barning,
whose native language is German, testified at one point in his
deposition that he "could not recall" the substance of a specific
meeting he had with Mundial representatives, he in fact *did*
testify on direct examination as to what was said at the meeting,
and then clarified on cross-examination that he did not
understand what was meant by "substance" in the context of the
earlier question.  That Mr. Barning has not verbally mastered the
English language is apparent from a review of his deposition

testimony.  It is therefore not surprising that the language he used in his written affidavit appears somewhat more refined.

Barning was a key European distributor for Softub spas who personally met with Mundial representatives multiple times regarding his concerns with the Syllent pump.  It strains credulity for Mundial to assert that Softub concealed his identity or that Mundial was prejudiced in any way from his allegedly belated disclosure.

Mundial's hearsay argument is similarly wanting.  The statements which Mundial contend are hearsay—for example, that McGarry told him that Mundial claimed the addition of internal filters to the pumps would prevent lock-ups—are not offered for the truth of the matter asserted—i.e., that the filter would actually prevent lockups—but for the fact that it was said. Likewise, Barning's statement in his Affidavit that Zirpolo told him the new rotor coating would solve many of the pump's problems is neither offered for the truth of the matter asserted, nor hearsay, as it is the statement of a party opponent.

 For all these reasons, Mundial's motion to strike will be denied.

### 3.  Dkt. 191

Mundial also moves to strike the Affidavit of Markus Zimmerman for substantially the same reasons it argued with

respect to the Affidavit of Christian Barning.  Its arguments
with respect to Mr. Zimmerman's affidavit are similarly strained
and lacks force.  The motion will be denied.

## B.  *Softub's Motion to Strike (Dkt. 172)*

Softub has moved to strike one of Mundial's affidavits and a
portion of another insofar as they provide failure statistics for
the Syllent pump in whirlpool bath applications, which Softub
contends Mundial failed to produce during discovery despite
repeated requests to do so.

A review of the record suggests a lack of candor by Mundial
on the subject of whirlpool bath failure statistics during
discovery, and the transcript of its 30(b)(6) deposition
indicates that the designee was either unprepared to discuss the
topic or deliberately obstructive.  I have, however, declined to
exclude the belatedly-produced whirlpool bath failure statistics
from my consideration of the summary judgment record, largely
because they actually support a number of Softub's claims
regarding the pump's lack of suitability for anything other than
a whirlpool bath application.[17]

---

[17] I note that Softub continues to press its motion (#193) to
compel aspects of a Rule 30(b)(6) deposition from the defendant.
The controversy regarding this motion concerns the use of a
30(b)(6) deposition to obtain testimony from the defendant's
Brazilian parent.  I will deny the motion without prejudice,
observing – as I did for the parties at the motion hearing – that
I will not countenance gamesmanship in discovery and that if

## V. MOTION TO PRECLUDE EXPERT TESTIMONY

Mundial has separately moved (Dkt. No. 218) to preclude the testimony of Softub's designated failure analysis expert, Harri Kytömaa, Ph.D.[18]  It has also moved to strike a supplemental report by Dr. Kytömaa prepared after his deposition in this case, which Softub attached as an exhibit to its opposition to Mundial's motion to preclude.

As previously noted in section I.G, Softub retained Dr. Kytömaa of Exponent Failure Analysis Associates to conduct an investigation into the cause or causes of the high failure rate it experienced with the Syllent pump.  Mundial does not challenge the qualifications of Dr. Kytömaa, who holds a Ph.D in Mechanical Engineering and focuses his professional activity in the "investigation and prevention of failures in mechanical systems." Rather, Mundial challenges the methodology employed by Dr.

_____

representatives of the Brazilian parent are to be offered as witnesses at trial, I will take practical steps to ensure that they have been deposed.

[18] Although Mundial's effort appears directed at precluding Dr. Kytömaa from testifying at trial, it also makes the argument–at least superficially–that Softub should not be permitted to rely on his testimony "in connection with any motion."  Even if I were inclined to grant Mundial's motion to preclude, which I am not, I note that it was filed over eight months after Mundial's motion for summary judgment–far too late to be considered in conjunction with summary judgment practice.  I do not, in any event, find that the outcome of the motion to preclude has any bearing on my resolution of the motion for summary judgment.

Kytömaa and in particular, the sources of data on which he relied in forming his opinion. Mundial also contends that Dr. Kytömaa's opinion that a number of separate flaws in the design or manufacture of the various versions of the Syllent pump "either individually or collectively caused the pumps to fail while in use with the Softub spa," should be excluded as inherently unreliable and legally insufficient to establish a causal relationship between any alleged defect and the failure of any particular unit.

### A. Standard for Admissibility of Expert Testimony

Under Federal Rule of Evidence Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702. Rule 702 assigns to the district court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Two principal criteria govern the exercise of a judge's discretion to admit or exclude expert testimony. First, the witness must be shown to be sufficiently qualified by "knowledge, skill, experience, training, or

education." Fed. R. Evid. 702. Second, Rule 702 requires the judge to consider whether "the testimony is based on sufficient facts or data"; whether "the testimony is the product of reliable principles and methods"; and whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 592–94. These criteria are designed "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 152 (1999). The ultimate purpose of the judge's "gatekeeper" function with respect to expert testimony is to ensure that the fact-finding process is not distorted by "expertise that is *fausse* and science that is junky." *Id.* at 159 (Scalia, J., concurring).[19]

### B.  *Opinion Regarding Causation*

Because it informs my analysis of Dr. Kytömaa's methodology, I first must clarify the purpose for which his testimony is offered.  As I discussed previously in addressing the

---

[19] I note that under Local Rule 7.1, the court may decide a motion on the papers without holding a hearing, and in this connection, it is incumbent upon counsel to seek leave to file a reply brief if he or she so desires.

applicability of the economic loss doctrine in section III.A.6.c,
this is in essence a contract case, and Softub's claims for
breach of warranty sound in contract. *See Jacobs* v. *Yamaha Motor
Corp.*, 649 N.E. 2d 758, 762-63 (Mass. 1995); *Bay State Spray &
Provincetown Steamship, Inc.* v. *Caterpillar Tractor Co.*, 533
N.E.2d 1350, 1352-54 (Mass. 1989); *Sebago, Inc.* v. *Beazer East,
Inc.*, 18 F. Supp. 2d 70, 89-90 (D. Mass. 1998); *W.R. Constr. &
Consulting Inc.* v. *Jeld-Wen, Inc.*, 2002 WL 31194870 at *6-7 (D.
Mass. Sept. 20, 2002). This is not a tort-based products
liability action, where the plaintiff is an end-user, lacking
privity with the manufacturer, who was injured by some alleged
defect in a product's design or manufacture that rendered it
"unreasonably dangerous." *See, e.g.*, *Evans* v. *Lorillard Tobacco
Co.*, 990 N.E.2d 997, 1010 (Mass. 2013) (citing Restatement
(Third) of Torts: Products Liability § 2, at 14 (1998)). Were it
such a case, Dr. Kytömaa's failure to arrive at a more precise
causation opinion might be problematic. *See Hochen* v. *Bobst
Grp., Inc.*, 290 F.3d 446, 451 (1st Cir. 2002) (stating, in a
products liability action, when "[t]he nature of the defect or
breach of warranty and its causal relation to the [injury is]
complex," a plaintiff must introduce expert testimony). In
contrast, in order to prevail on its contract-based claims for
breach of warranties both express and implied, Softub must only

prove, in broad terms, that the Syllent pump failed to perform its ordinary or manifestly-intended function.

Mundial's argument attacking Dr. Kytömaa's "causation" opinion rests on a fundamental misunderstanding of the nature of Softub's allegations in this case. Indeed, virtually every decision cited by Mundial in support of its argument that Dr. Kytömaa's causation opinion is somehow deficient arose in the products liability context, where an expert opinion on defect and causation is a necessary element of the prima facie case. Here, however, Dr. Kytömaa's opinion is offered only as corroborating overview evidence that the Syllent pump was, for various reasons relating to its design and manufacture, unsuitable for use in spa applications. His use of the term "defects" to describe the flaws in the design of the pump does not transform this contract action into a tort-based products liability action. Nor does his failure to identify a singular technical cause of any specific pump failure render his testimony irrelevant or unhelpful to the jury.

### C. *Methodology and Data*

The bulk of Mundial's memorandum in support of its motion to preclude Dr. Kytömaa's testimony is directed toward attacking the data he relied upon in reaching his opinion regarding the various design flaws in the Syllent pump. Principally, Mundial contends

that the "five main sources of data" Dr. Kytömaa relied upon constitute an insufficient basis under Fed. R. Evid. 702 for his opinion concerning the nature of defects in the pump and their contribution to the pumps' failures.  Those five sources of data are 1) a log generated by Softub documenting Syllent pump failures from July 2008 through March 2013; 2) a list of 23 "failure modes" prepared by Softub; 3) a spreadsheet generated by Lifepark GmbH listing "all the observed failures" of European model Syllent pumps; 4) Twelve failed pumps selected by Lifepark GmbH for examination by Dr. Kytömaa; and 5) Twenty-one failed Syllent pumps supplied to Dr. Kytömaa by Softub in connection with an earlier fire risk investigation he conducted in 2012.

The crux of Mundial's objection to the first three sources of data is that Dr. Kytömaa uncritically embraced them without making any effort to determine their provenance or reliability. Mundial points to several apparent inconsistencies between the documents–particularly with respect to word choice in describing categories of alleged defects leading to failures–to argue that they cannot be relied upon as an accurate record of actual, individual instances of pump failures.  If Dr. Kytömaa's testimony regarding the contents of these documents were offered to prove that each pump identified therein indeed failed for the precise reason stated, Mundial might have a point.  However, in

advancing its argument, Mundial again misunderstands the limited purpose for which Dr. Kytömaa's testimony is offered.

There is abundant evidence in the record concerning the large numbers of varying types of failures Softub experienced with the Syllent pump. There is also substantial evidence, including in the form of admissions made by Mundial prior to the commencement of this litigation, that the high failure rate of the Syllent pump in the Softub application was due to the pump's fundamental lack of suitability for the spa application. The purpose of Dr. Kytömaa's testimony is to explain to the jury those specific aspects of the design of the Syllent pump, that in his opinion, rendered it unsuitable for use in spas and led to the unacceptably high failure rate experienced by Softub. He formed his opinion concerning the design of the pump primarily by reviewing technical materials produced by Mundial and conducting his own examination of individual Syllent pump units that had failed in the field for one reason or another. After identifying flaws in the pump design based upon his examination of the failed pumps, he rendered his opinion that the types of flaws he identified in the failed pumps were consistent with the types of issues that Softub and Lifepark reported experiencing in the field.

It is permissible for an expert to testify to an opinion
that relies in part on an assumption so long as that assumption
is consistent with other evidence offered at trial. *See Levin* v.
*Dalva Brothers, Inc.*, 459 F.3d 68, 79 (1st Cir. 2006); *Coleman* v.
*De Minico*, 730 F.2d 42, 26 (1st Cir. 1984). To the extent
Mundial alleges that the collection of failed pumps Dr. Kytömaa
examined was somehow not a representative sample of the universe
of pumps that are the subject of this lawsuit, it may explore
this line of inquiry on cross examination. I do not however find
any reason to preclude Dr. Kytömaa from testifying to his
opinions concerning either the flaws he identified in the sample
units he examined, or, based on his expertise and analysis of the
Syllent pump's design, the likely cause or causes of the types of
failures reportedly experienced by Softub in the field.[20]

---

[20] Mundial has moved (Dkt. No. 236) to strike Exhibit B to
Softub's Opposition to its Motion to Preclude Dr. Kytömaa from
testifying, on the grounds that it constitutes an untimely expert
disclosure not properly within the contemplation of Fed. R. Civ.
P. 26(e) governing supplemental disclosures. Although Exhibit B
is merely a cover letter written by Dr. Kytömaa to counsel for
Softub summarizing the contents of an accompanying optical disk,
I understand Mundial's motion to be directed at the contents of
the disk itself. To be sure, Dr. Kytömaa's supplemental
disclosure was produced after the close of expert discovery.
However, the authorities cited by Mundial in support of its
motion to strike Exhibit B are largely inapposite, as they
generally concern surprise disclosures made on the eve of trial
of new expert opinions and theories which would have had a
material impact on the shaping of the litigations and result in
substantial prejudice to the opposing parties. Here, to the
extent that the cover letter accurately summarizes the materials

# VI. CONCLUSION

For the reasons stated more fully above, Mundial's Motion for Summary Judgment (#149) is GRANTED as to Counts I, II, VII, X and XI and so much of Counts III, IV, VIII and IX as are premised only on Softub's purchase orders, and otherwise DENIED. Softub's Motion for Partial Summary Judgment on Mundial's Counterclaim One (#138) is GRANTED.

All discovery-related Motions to Strike (#154, #172, #188, #189 & #191) are DENIED. Mundial's Motion to Preclude Plaintiff's Designated Expert (#218) is DENIED. Mundial's Motion

---

contained on the disk–which has not been provided to the court in connection with Mundial's motion to strike–Dr. Kytömaa's supplemental disclosure merely provides additional support for opinions he disclosed in his original report and/or testified to at his deposition. The only genuinely novel material purportedly contained in the supplemental disclosure is offered to rebut the suggestion made by counsel for Mundial at Dr. Kytömaa's deposition that consumers' use of extension cords may have contributed to the high failure rate of the Syllent pump. Mundial has not suffered any prejudice as a result of this supplemental disclosure and will be afforded the opportunity to depose Dr. Kytömaa concerning the contents of the disclosure if it so chooses. Accordingly, Mundial's motion to strike will be denied. *See, e.g., Allstate Interiors & Exteriors Inc.*, v. *Stonestreet Constr., LLC*, 730 F.3d 67, 75-76 (1st Cir. 2013) (affirming district court's decision to allow supplemental expert disclosure pursuant to Fed. R. Civ. P. 26(e), which was produced after the close of expert discovery but a year before trial, on the grounds that the supplemental disclosure "did not change the opinions initially expressed in his expert report" or result in prejudice to the opposing party.)

to Strike Opposition to Motion, Exhibit B (#236) is DENIED.

Softub'S Motion to Compel a Rule 30(b)(6) Deposition (#193) is

DENIED without prejudice.



**_/s/ Douglas P. Woodlock_**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT